# Exhibit B



NEW YORK
CITY BAR

*Report by the*
*Committee on International Commercial Disputes*

**Recommended Procedures for Recognition and Enforcement
of International Arbitration Awards Rendered
Under the ICSID Convention**

July 2012

# TABLE OF CONTENTS

Page

I.   Introduction ........................................................................................................ 1

II.  Treaty and Statutory Framework ....................................................................... 2

    A.   The ICSID Convention ............................................................................ 2

    B.   U.S. Enabling Legislation: 22 U.S.C. §1650a ......................................... 8

    C.   The Foreign Sovereign Immunities Act .................................................. 9

    D.   Problems with the Existing Framework ................................................. 10

III. Recognition and Enforcement of ICSID Awards Under the U.S. Model
    BIT and NAFTA ................................................................................................ 13

    A.   BITs Signed from 1982 to 2004 ............................................................ 14

    B.   BITs Signed Since 2004 ......................................................................... 15

    C.   NAFTA ................................................................................................... 16

IV.  Procedures Adopted by Other Signatory States and Authorities ..................... 16

V.   Review of Cases in the United States Involving ICSID Awards ...................... 19

    A.   *LETCO* ................................................................................................... 19

    B.   *Enron* and *Sempra* ............................................................................... 20

    C.   *Siag* ....................................................................................................... 21

    D.   Issues Raised, but Left Unanswered ...................................................... 25

VI.  Proposed Recognition and Enforcement Procedures ........................................ 26

I.      **Introduction**

The Convention on the Settlement of Investment Disputes between States and Nationals of other States (the "ICSID Convention") is a multilateral treaty, formulated by the World Bank and ratified by 147 countries including the United States, that entered into force on October 14, 1966.[1]  The ICSID Convention established the International Centre for Settlement of Investment Disputes ("ICSID"), which creates a mechanism and the facilities by which disputes between private investors and foreign States are resolved through international arbitration.  The kinds of investment disputes that have been the subject of ICSID arbitrations vary widely, and include disputes concerning alleged expropriation of an investment by a member State, claims of unfair and inequitable treatment of the investor and the investment, and a myriad of breach of contract disputes relating to investments.  The amounts at stake in these cases often are significant: several ICSID arbitrations have resulted in awards exceeding $100 million, and some of the claims currently pending exceed one billion dollars.

Unlike international arbitration awards under different arbitration systems, the terms of the ICSID Convention and the rules of arbitration that govern the process and procedures of an ICSID arbitration provide for a self-contained arbitral system that eliminates review of the arbitral award by national courts of any member country.[2]  The avenue of relief from an ICSID award is to follow the specific procedure for interpretation, revision or annulment of the award that is established in the ICSID Convention itself, and in the ICSID Rules.[3]

Although an ICSID award is not subject to any judicial challenge, it still must be brought to a national court for recognition and enforcement if a losing party refuses to abide by its obligation to comply with the terms of the award.  Article 54 of the ICSID Convention requires national courts of the Contracting States to "recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations

---

[1] Mar. 18, 1965, 17 U.S.T. 1270, 575 U.N.T.S. 159.

[2]     *See, e.g.*, ICSID Convention Art. 53 (ICSID awards "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention.").

[3]     *See* ICSID Convention, Arts. 50-52; ICSID Rules 50 *et seq.  See also* REED, PAULSSON, ET AL., GUIDE TO ICSID ARBITRATION (Kluwer Law International 2004), at 179–80 ("A strength of the ICSID Convention is that it is even more favorable to recognition and enforcement of awards than the New York Convention.  The ICSID Convention accepts no grounds whatsoever for national courts to refuse recognition and enforcement of ICSID tribunal awards.  It requires, instead, that the national courts of Contracting States recognize and enforce monetary awards immediately, as if they were final judgments of the local courts themselves.  The courts may not vacate ICSID awards, because they are a-national and subject to the ICSID treaty regime rather than to national law.").

imposed by that award within its territories as if it were a final judgment of a court in that State."[4] Yet it does not prescribe procedures that national courts should follow to comply with this treaty obligation. Article 54 provides merely that the prevailing party should present to an enforcement court a copy of the award, certified by the ICSID Secretary General.[5] And in countries with a federal court system such as in the United States, such court should treat the ICSID award as if it were "a final judgment of the courts of a constituent state."[6]

The U.S. enabling legislation for the ICSID Convention, 22 U.S.C. §1650a, does not supplement usefully the sparse guidance in the ICSID Convention. It provides basically that the federal courts in the United States shall have exclusive jurisdiction over actions to enforce ICSID awards.

With the lack of prescribed procedures for recognizing ICSID awards and entering judgment, the federal district court in the Southern District of New York has applied different procedural approaches to recognizing and enforcing ICSID awards, which underscores the need for clarity as to the process for entering such awards as enforceable judgments.

Drawing on relevant case law, the ICSID Convention and related U.S. statutes, procedures followed by other signatories to the ICSID Convention, and discussions with practitioners in the field, this report sets forth recommended procedures to be followed by practitioners in the federal district court for the Southern District of New York in seeking recognition and enforcement of an ICSID international arbitration award. These procedures are designed to facilitate the swift recognition and enforcement of awards and entry of judgment, as the ICSID Convention contemplates. This report and these procedures do not touch upon the process of executing upon the judgment in the event that the party against whom the judgment is directed refuses to pay voluntarily. Executing upon a judgment by attempting to seize assets of the judgment debtor is subject to all of the applicable laws and protections of the jurisdiction where enforcement is sought, including, in the United States, the Foreign Sovereign Immunities Act.

## II.    **Treaty and Statutory Framework**

### A.    *The ICSID Convention*

ICSID arbitral awards are different from every other kind of arbitral award because they are not subject to judicial review. The ICSID system provides for a

---

[4]    ICSID Convention, Art. 54(1).

[5]    ICSID Convention, Art. 54(2).

[6]    ICSID Convention, Art. 54(1).

self-contained dispute resolution process that is intended to foreclose the review by any court of final arbitral awards.

Article 52 of the ICSID Convention establishes the process by which either party may request annulment of the award by an annulment committee convened within the ICSID system.  Article 52(1) provides that either party may request annulment "by an application in writing addressed to the [ICSID] Secretary-General" and sets forth five grounds for seeking annulment, each of which is relatively narrow in scope.[7]  Article 52(2) requires that the annulment application be made within 120 days after the date on which the award was rendered, except that when annulment is requested on the ground of corruption, such application shall be made within 120 days after discovery of the corruption but within three years after the date on which the award was rendered.

Section 6 of the ICSID Convention, which is comprised of Articles 53, 54, and 55, is entitled "Recognition and Enforcement of the Award."  Article 53 provides that the award "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."  It further provides that each party "shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention."  Article 53 reflects the intent and desire of those States subscribing to the ICSID Convention that parties would abide by and comply with the terms of an arbitral award.[8]  An obligation to satisfy an award arises at the time the award is issued, and is not dependent upon the recognition or enforcement of the award by a national court.

---

[7]    The five grounds for annulment listed in Article 52(1) are: (a) that the Tribunal was not properly constituted, (b) that the Tribunal has manifestly exceeded its powers, (c) that there was corruption on the part of a member of the Tribunal, (d) that there has been a serious departure from a fundamental rule of procedure, or (e) that the award has failed to state the reasons on which it is based.

[8]    *See, e.g.*, S.A. Alexandrov, *Enforcement of ICSID Awards: Articles 53 and 54 of the ICSID Convention*, *in* Transnational Dispute Management, Vol. 6, No. 1 March 2009, at 2–3 ("Article 53(1) requires the parties to an arbitration -- including the State party -- to 'abide and comply with the terms of the award.'  This obligation exists only for the parties to the arbitration and applies equally to the investor and the State."); G. Bottini, *Recognition and Enforcement of ICSID Awards*, *in* Transnational Dispute Management, Vol. 6, No. 1 March 2009, at 2 ("Article 53 only applies to the parties to the dispute.  They are both required to respect the final and binding nature of the award . . . and abide by and comply with it.").

Article 54 of the Convention requires all member States to recognize and enforce an ICSID award.[9]  Article 54 provides in full:

> (1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

> (2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

> (3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

The first sentence of Article 54(1) provides that each State "shall recognize" an award as binding.  Recognition is "the formal certification that an ICSID award is a final and binding disposition of contested claims," and its primary purpose is "to confirm the *res judicata* effect of an award."[10]  Pursuant to the mandatory language in Article 54(1),

---

[9]     *See* Alexandrov, *supra* note 8, at 3 ("Article 54 requires all Contracting States to the ICSID Convention to recognize and enforce all awards rendered pursuant to the Convention."); Bottini, *supra* n. 8, at 2 ("Article 54 expressly applies to all Contracting States, including the State party to the dispute, which are required to recognize the award as binding and enforce it 'as if it were a final decision of a domestic court.'").

[10]    REED, PAULSSON, ET AL., *supra* n. 3, at 179; *see also* CHRISTOPH H. SCHREUER, THE ICSID CONVENTION: A COMMENTARY, at 1128 (2d ed. 2009) ("Recognition of an award is the formal confirmation that an award is authentic and that it has the legal consequences provided by the law.").  This is consistent with the use of the term "recognition" in the New York Convention: "The recognition of arbitral awards is the process that makes arbitral awards part of a national legal system.  Recognition is most often sought in the context of another proceeding.  For example, a party will request the recognition of an arbitral award in order to raise a defense of *res judicata* and thus bar the re-litigation in court of issues that have already been resolved in a foreign arbitration, or a party will seek set-off in court proceedings on the basis of a foreign arbitral award.  Because recognition often acts as a

courts have no discretion to review ICSID awards at the recognition phase.[11]   Indeed, as detailed below, a failure by a Contracting State to recognize an award likely would be considered a treaty violation.[12]

Article 54(1) also provides that each State shall "enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."   There has been much debate over the meaning of the term "enforce" or "enforcement" as used in Article 54, and whether it has a distinct meaning from either "recognition" or "execution," both of which also are used in Article 54.   As noted by leading commentators Lucy Reed and Jan Paulsson:

> In some legal systems, enforcement refers to the judicial practice of issuing 'exequatur', or declaring in an order that an arbitration award is in fact enforceable.   In other legal systems, 'enforcement' loosely refers to an award creditor's legal right to execute its award -- i.e., to collect monetary damages or benefit from other remedies granted -- and is thus another way of referring to execution.[13]

---

defensive mechanism, it is frequently described as a shield."   ICCA'S GUIDE TO THE INTERPRETATION OF THE 1958 NEW YORK CONVENTION: A HANDBOOK FOR JUDGES, at 9 (ICCA 2011).

[11]   *See* Antonio R. Parra, *The Enforcement of Arbitral Awards Against Sovereigns -- The Enforcement of ICSID Arbitral Awards*, *in* ENFORCEMENT OF ARBITRAL AWARDS AGAINST SOVEREIGNS (R. DOAK BISHOP, ed., 2009), at 132 ("[R]ecognition and enforcement of the award may be obtained from the competent court of a Contracting State on simple presentation of a copy of the award certified by the Secretary-General of [ICSID]."); SCHREUER, *supra* n. 10, at 1128 ("ICSID awards must not be made subject to conditions for recognition not provided by the Convention.  Nor is it permissible to subject them to review at the stage of recognition.  The domestic court's or other authority's task is limited to verifying the authenticity of the ICSID award."); Georges R. Delaume, *Recognition and Enforcement of State Contract Awards in the United States: A Restatement*, 91 Am. J. Int'l. L. 476, 484 (1997) ("Suffice it to recall that the recognition process is made extremely simple: any party may obtain recognition of an award by furnishing a copy of the award, certified by the Secretary-General of ICSID, to the competent court (or other authority) designated for this purpose by each contracting state."); Albert van den Berg, *Recent Enforcement Problems under the New York and ICSID Conventions*, Arbitration International, (Kluwer Law International 1989, Volume 5 Issue 1), at 3 ("Enforcement of an ICSID award in a contracting state is quite simple.  A party seeking enforcement merely needs to supply a copy of the award certified by the Secretary-General of ICSID to the court.").

[12]   *See* SCHREUER, *supra* n. 10, at 1125, quoted *infra* at 16.

[13]   REED, PAULSSON, ET AL., *supra* n. 3, at 180.

Similarly, another leading commentator, Christoph Schreuer, notes that "courts and authors have used the term 'enforcement' variously to denote 'execution,' 'recognition' or a broad concept embracing all steps covered by Art. 54," and warns that "great caution should be exercised when using the word 'enforcement' in the context of Art. 54."[14]

Ultimately, these commentators ascribe different meanings to the term "enforcement." On the one hand, Reed and Paulsson conclude that "[i]n the context of ICSID arbitration, enforcement is generally indistinguishable from recognition. The two terms -- recognition and enforcement -- tend to be used in a single phrase that broadly refers to all steps leading up to, but stopping short of, actual execution of an award."[15] Schreuer, on the other hand, uses the term "'enforcement' as meaning the same as 'execution' unless indicated otherwise."[16] He bases his conclusion, *inter alia*, on the fact that the equally authentic French and Spanish texts of the Convention do not use the term "enforcement" at all, but rather use the term "execution" where the English text uses the term "enforcement."[17] Neither of these approaches attributes an autonomous, distinct meaning to the term "enforcement," despite the fact that all three terms ("recognition," "enforcement," and "execution") appear in the English text of Article 54 of the ICSID Convention. Adding to the confusion is the fact that practitioners and judges in the United States often use the terms "recognition," "enforcement," and "execution" in different ways and interchangeably.

This Committee views recognition, enforcement and execution in the ICSID award context as points progressing along a single continuum as follows: (1) "recognition" refers to confirmation or certification of an ICSID award as a final and binding disposition of claims, with *res judicata* effect; (2) "enforcement" refers to converting the ICSID award into a judicial judgment that orders an award debtor to comply with the award, including paying any monetary sum due; and (3) "execution" refers to coercive measures that an award creditor may take when an award debtor refuses to pay the converted award voluntarily.[18]

---

[14]    SCHREUER, *supra* n. 10, at 1136.

[15]    REED, PAULSSON, ET AL., *supra* n. 3, at 180. *See also* SCHREUER, *supra* n. 10, at 1133–34, nn. 70–71 (*citing*, *inter alia*, G. Delaume, R. Buckley, O. Chukwumerjie, and N. Ziadé).

[16]    SCHREUER, *supra* n. 10, at 1136.

[17]    SCHREUER, *supra* n. 10, at 1134. *See also id.* at 1135 ("the interpretation that best reconciles the three texts would appear to be that the words 'enforcement' and 'execution' are identical in meaning. This is more plausible than the alternative of giving different meanings to the same French and Spanish words in paras. 1 and 2 on the one hand and in para. 3 on the other.").

[18]    These steps include, for example, conducting post-judgment inquiries to locate assets, petitioning a court to issue writs of execution, serving restraining notices upon financial

Article 54(2) sets forth the procedure for recognizing and enforcing an ICSID award in a very general way. That provision states that a party seeking recognition and enforcement shall furnish to a competent court or other designated authority a copy of the award certified by the Secretary-General. Noticeably absent from Article 54(1) and (2) is any detail as to how the process for recognizing and enforcing an ICSID award should work. This is not surprising given that the 147 member States consist of both civil and common law systems and have disparate procedures for recognizing and enforcing awards and final judgments. As a practical matter, the ICSID drafters could not set forth in detail uniform procedures for each domestic court given the vagaries of each court system. Notwithstanding the foregoing, Article 54 makes it clear that all Member States shall (i) recognize an ICSID award as binding, and (ii) permit the enforcement of the monetary obligations imposed by the award.

Article 54(3) provides that the execution of awards shall be governed by the laws of the State in which judgment was entered. This provision preserves the rights of the judgment debtor under the local laws of the particular State in which enforcement is sought. The absence of similar language in the context of "recognition" in Article 54(1) suggests that recognition "is subject only to the requirements of the Convention and may not be refused for reasons of domestic law"[19] and that "States do not have the same procedural flexibility with respect to recognition."[20]

In circumstances where a judgment debtor is a sovereign State, Article 55 of the ICSID Convention clarifies that "[n]othing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution." The applicability of this immunity provision is limited to the execution stage.[21] Thus, in the U.S., for example, this provision preserves the rights of a foreign sovereign under the Foreign Sovereign Immunities Act ("FSIA") with respect to execution.

---

institutions to freeze assets, and having a sheriff seize assets pursuant to writs of execution or that otherwise have been frozen.

[19] SCHREUER, *supra* n. 10, at 1129. *See also id.* at 1153 ("Under Art. 54(3) only execution but not recognition is governed by the law of the forum State.").

[20] SCHREUER, *supra* n. 10, at 1149.

[21] It has no bearing on the recognition phase of the process. *See* SCHREUER, *supra* n. 10, at 1129 ("The provision on sovereign immunity from execution in Art. 55 does not apply at the stage of recognition. Submission to arbitration may be seen as a waiver of immunity in proceedings to have the award recognized. Therefore, the effect of the award as *res judicata* will apply irrespective of any immunity from execution.").

B.    *U.S. Enabling Legislation: 22 U.S.C. §1650a*

In the United States, the ICSID Convention implementing statute, 22 U.S.C. §1650a, provides in relevant part:

> (a)  An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act shall not apply to enforcement of awards rendered pursuant to the convention.

> (b)  The district courts of the United States shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy.

The plain language of the statute provides that an ICSID award creates a right arising under a treaty of the United States, and that the pecuniary obligations imposed by such an award shall be enforced and given the same "full faith and credit" as if the award were a final judgment of a court in the United States.  Article IV of the U.S. Constitution, the "Full Faith and Credit Clause," requires states to recognize judgments rendered by the courts of other states.[22]  The Full Faith and Credit Clause applies in the context of federal courts recognizing state court judgments pursuant to 28 U.S.C. §1738.[23]  Under 28 U.S.C. §1738, a federal court must honor judgments of the courts of the fifty states.[24]

---

[22]    U.S. Const. art. IV, §1.

[23]    The full text of Section 1738 reads:

> The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.

> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

[24]    Notably, recognition under 28 U.S.C. §1738 is obtained via a procedure substantially the same as that required under ICSID Article 54(2).  Specifically, both simply require the

Accordingly, 22 U.S.C. §1650a(a) makes clear that ICSID awards shall be provided the same full faith and credit as a state court judgment for purposes of enforcing the ICSID award's pecuniary obligations.[25]

Section 1650a also provides expressly that the Federal Arbitration Act ("FAA") does not apply to the enforcement of ICSID awards.  This reinforces the concept that ICSID awards are not subject to judicial court review.  As noted by Aron Broches, the architect of the ICSID Convention, "[i]t is clear . . . that [Section 1650a] was not intended to leave open even a theoretical possibility" of a review of the rendering tribunal's jurisdiction and observance of due process, which "would have been contrary to the provisions of the Convention."[26]

The statute only speaks to "enforcement" of awards, and fails to identify procedures to be followed in that phase of the proceedings.[27]  Similarly absent from 22 U.S.C. §1650a is any reference to "recognition" procedures.  The proposition that minimal procedural steps are required to recognize an ICSID award is consistent with the text of Article 54(2) of the ICSID Convention, which provides that "[a] party seeking recognition or enforcement" is required only to "furnish . . . a copy of the award certified by the Secretary-General."

C.     *The Foreign Sovereign Immunities Act*

ICSID arbitration necessarily involves a foreign sovereign.  As mentioned above, Articles 54(3) and 55 of the ICSID Convention provide that the execution of ICSID awards is governed by the laws of the State in which execution is sought and is subject to

---

judgment or award creditor to submit an authenticated copy of the judgment or award (as the case may be) of which recognition is sought.

[25]     Roger P. Alford, *Federal Courts, International Tribunals, and the Continuum of Deference*, 43 Va. J. Int'l L. 675, 686–87 (2003).  Alford continues: "The full faith and credit obligation as applied to ICSID tribunals reflects the obligations to treat judgments as final and binding and the same as constituent state court judgments."  *Id.* at 693.

[26]     Aron Broches, *Awards Rendered Pursuant to the ICSID Convention: Binding Force, Finality, Recognition, Enforcement, Execution*, 2 ICSID Review 287, 323 (1987) (explaining that "the Federal Arbitration Act shall not apply to the enforcement of Convention awards"; citing a 1966 Treasury Department memorandum issued in conjunction with the adoption of § 1650a).

[27]     *See* Edward G. Kehoe, *The Enforcement of Arbitral Awards Against Sovereigns -- Enforcement of ICSID Arbitral Awards -- United States*, *in* ENFORCEMENT OF ARBITRAL AWARDS AGAINST SOVEREIGNS (R. DOAK BISHOP, ed., 2009), at 250 ("22 U.S.C. §1650a does not specify the procedural mechanism, whether it be in the form of registration, a motion, complaint or otherwise, by which a party converts an ICSID award into an enforceable U.S. federal court judgment.").

the sovereign immunity laws of that State.  Accordingly, proceedings in the United States to execute ICSID awards implicate the FSIA, which affords significant protections to foreign sovereigns concerning the execution of judgments.  For example, no execution activity against a foreign sovereign may be undertaken until the federal court has expressly ordered attachment and execution.  Specifically, 28 U.S.C. §1610(c) requires district courts to determine that "a reasonable period of time has elapsed following the entry of judgment" prior to granting leave to commence execution activities.  This requirement is designed to afford a foreign sovereign sufficient time to pay the judgment if it chooses to do so voluntarily.  A party seeking to execute a judgment against a foreign sovereign must first make a motion to the district court pursuant to 28 U.S.C. §1610(c) explaining why it believes that a reasonable period of time has elapsed and why execution should be permitted.  What constitutes a "reasonable period of time" is within the broad discretion of the court and depends upon the facts and circumstances of each case.[28]

The FSIA also protects sovereigns by limiting the property that is subject to execution.  Under the FSIA, only property that is used for commercial purposes is subject to execution to satisfy a judgment.  Specifically, 28 U.S.C. §1610(a) provides, in relevant part, that the property of a foreign state that is used for a commercial activity in the United States shall not be immune from execution or attachment where a judgment is based on an order confirming an arbitral award.[29]  Accordingly, a party seeking to attach the assets of a foreign sovereign must first show that the assets are used for commercial and not sovereign purposes.  This is usually done through motion practice before execution occurs; the party seeking to execute usually files a motion identifying the assets to be seized and explaining why such assets are commercial rather than sovereign in nature.

D.     _Problems with the Existing Framework_

Article 69 of the ICSID Convention imposes an obligation upon each Member State to take legislative and other measures necessary to make the ICSID Convention effective, including with respect to recognition and enforcement.  As Professor Schreuer has noted:

> Failure of a State party to the Convention to recognize and enforce an award would be a breach of a treaty obligation . . .  Non-compliance with Art. 54, whether on the basis of local law or not, would carry the usual consequences of State responsibility, including diplomatic protection.  The State of the nationality of an

---

[28]     *See Ned Chartering & Trading Inc. v. Pakistan*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001); *Ferrostaal Metals Corp. v. S.S. Lash Pacifico*, 652 F. Supp. 420, 423 (S.D.N.Y. 1987).

[29]     *See* 28 U.S.C. §1610(a)(6).

> investor who has prevailed in an ICSID arbitration could bring an
> international claim against a State that was not a party to the
> arbitration but whose court and authorities have failed to recognize
> and enforce the award in violation of Art. 54.  This would include
> the right to refer the dispute to the International Court of Justice in
> accordance with Art. 64.  In the case of a victorious host State,
> failure by the investor's State of nationality or by any other State
> party to the Convention to recognize and enforce the award would
> have the same consequence.[30]

In light of these serious implications engaging a State's international responsibility, clear and consistent procedures for the recognition and enforcement of ICSID awards are important.  Yet, as discussed above, the U.S. enabling legislation does not establish any such procedures, which raises risks.  A domestic court could, for example, impose procedural burdens that interfere with the swift recognition and enforcement of an ICSID award.

1.    Risk of Challenges Under the Requirement of
22 U.S.C. §1650(a) to Afford "Full Faith and Credit"

One risk is that the requirement under 22 U.S.C. §1650a to afford "full faith and credit" to ICSID awards may encourage a party contesting recognition or enforcement to argue that one or more of the exceptions to the requirement of full faith and credit apply to ICSID awards.[31]  As a practical matter, however, those exceptions are so narrow and limited they effectively should eliminate any viable challenge to the recognition and enforcement of an ICSID award.

One defense to the application of full faith and credit is the rendering court's lack of jurisdiction over the judgment debtor.  This defense is subject to a significant exception: If the issue of jurisdiction has fully been litigated in the rendering court, or if the respondent appeared and did not contest jurisdiction, the relitigation of that issue is precluded.[32]  In the context of ICSID arbitrations, responding parties always have the opportunity to contest the tribunal's jurisdiction, and almost uniformly do.  Therefore, the only situation in which lack of jurisdiction would provide a valid bar to enforcement or recognition of an ICSID award based on a full faith and credit defense would be when the

---

[30]    SCHREUER, *supra* n. 10, at 1125.

[31]    *See generally* William L. Reynolds, *The Iron Law of Full Faith and Credit*, 53 Md. L. Rev. 412 (1994).

[32]    *Id.* at 424–25.

11

respondent was not afforded the opportunity to contest the claim or refused to participate in the arbitration at all (thereby foregoing the opportunity to contest the merits).[33]

Another defense to full faith and credit is available when the rendering court's judgment was procured by fraud. Its practical application also is limited. As an initial matter, allegations of "intrinsic fraud" (*e.g.* the use of fabricated evidence) in the underlying ICSID arbitration are adjudicated by the Tribunal itself, or if discovered within three years of an award, by an annulment panel. Refusing challenges to enforcement or recognition of ICSID awards based on intrinsic fraud would be consistent with the "self-contained" structure of ICSID, which provides a process for addressing these frauds.[34] On the other hand, the existence of "extrinsic fraud" (*i.e.* fraud that deprives a litigant of its opportunity to appear and contest) may provide a defense to full faith and credit in the same manner as a defense based on lack of jurisdiction in the context of a default judgment, but only under similarly limited circumstances in which a party to an ICSID arbitration has been denied the opportunity to litigate.

The third potentially applicable defense based on full faith and credit concerns the so called "penal exception," which provides that otherwise valid judgments are not entitled to full faith and credit if they are penal in the "international sense."[35] Although the availability of such damages as a matter of international law is beyond the scope of this paper,[36] this narrow exception could be implicated only in the event of an award of punitive or moral damages in favor of a state, and only when permitted by the relevant treaty or agreement.

---

[33]   Some commentators describe such a defense as one based on lack of due process. *See, e.g.*, Edward Baldwin, Mark Kantor & Michael Nolan, *Limits to Enforcement of ICSID Awards*, 23 J. Int'l Arb. 1, 12 (2006). However, the authors of this paper believe that this is better understood as a variation of the lack of jurisdiction defense where jurisdiction is not contested in the original forum.

[34]   *See* Reynolds, *supra* n. 31, at 422–24 (noting that "many courts distinguish between extrinsic and intrinsic procedural fraud" when determining the scope of this exception to full faith and credit, while observing that "[m]any modern authorities . . . have rejected this position" and permit challenges based on any type of fraud.

[35]   *Huntington v. Attrill*, 146 U.S. 657, 673–74 (1892) ("The question whether a statute of one state, which in some aspects may be called penal, is a penal law, in the international sense, so that it cannot be enforced in the courts of another state, depends upon the question whether its purpose is to punish an offense against the public justice of the state, or to afford a private remedy to a person injured by the wrongful act.").

[36]   *See generally* James Crawford, The International Law Commission's Articles on State Responsibility 219 (2002); Nina H.B. Jorgensen, *A Reappraisal of Punitive Damages in International Law*, [1997] Brit. Y.B. Int'l L. 247; N.Y.S. Bar Ass'n, *Report on Punitive Damages in International Commercial Arbitration* (1992).

As the above analysis demonstrates, 22 U.S.C. §1650a should not be read to open the door to creative arguments based on narrow exceptions to the full faith and credit that ICSID awards are entitled to receive.  Absent the extraordinary and limited defenses to full faith credit, a federal district court may not subject an ICSID award to any substantive review whatsoever.[37]

### 2.   Risk of Concurrent Proceedings

Still another open issue is that recognition and enforcement proceedings could begin even though annulment proceedings are pending.  Article 52 of the ICSID Rules provides that parties seeking annulment of an ICSID arbitral award must commence annulment proceedings within 120 days from the date that the award was rendered. However, nothing in the ICSID Convention requires the victorious party to wait until that 120-day period has elapsed before seeking recognition or enforcement of the award. While the drafters of the ICSID Convention may have assumed that winning party would voluntarily wait to enforce the award if annulment proceedings were pending, this assumption may not always comport with reality.  The result is that some prevailing parties may be inclined to commence enforcement proceedings as quickly as possible notwithstanding the possibility or even the existence of annulment proceedings.[38]

## III.   Recognition and Enforcement of ICSID Awards
## Under the U.S. Model BIT and NAFTA

Both the U.S. Model BIT and the North American Free Trade Agreement ("NAFTA") prohibit a party from enforcing an ICSID award until after expiration of the time allowed to seek annulment or revision of the award.  These provisions in the U.S. Model BIT and NAFTA could be interpreted to demonstrate a U.S. policy preference for greater certainty or "finality" of ICSID awards before enforcement of such awards above and beyond what the ICSID Convention itself requires.  Indeed, although the ICSID Rules similarly contemplate the possibility of staying enforcement of an ICSID award

---

[37]   An ICSID award debtor is free to utilize defenses to execution available to it in the United States, such as those prescribed by the Foreign Sovereign Immunities Act and local state enforcement regimes such as Article 52 of New York's Civil Practice Law and Rules which governs the satisfaction of money judgments in New York.  These defenses focus upon whether assets in New York targeted by the judgment-creditor are the appropriate subject of execution efforts.  They do not raise any challenges to the ICSID arbitration award itself.

[38]   This risk is substantially minimized by ICSID Rule 54, which provides that a party applying for annulment of an award may request "a stay in the enforcement of part or all of the award to which the application relates."   A party may make this request in its application for annulment at which point the ICSID Secretary-General "shall . . . inform both parties of the provisional stay of the award," pending the constitution of the annulment committee.  ICSID Rule 54(2).

pending annulment proceedings,[39] the Rules do not require a stay of enforcement, but rather leave it as a matter within the annulment Committee's discretion.  In all events, neither the U.S. Model BIT nor NAFTA nor the ICSID Rules contemplate a stay of recognition pending annulment proceedings.

A.    *BITs Signed from 1982 to 2004*

The United States negotiates bilateral investment treaties ("BITs") on the basis of a Model BIT drafted by the State Department.[40]  From 1982 until 2004, when the 2004 U.S. Model BIT was adopted, the United States negotiated and signed more than forty BITs.  Although some do not provide for ICSID dispute resolution, the vast majority call for binding arbitration under the ICSID Rules, the ICSID Additional Facility Rules, or the UNCITRAL Arbitration Rules.

It was not until the United States signed BITs with Poland and Slovakia in 1990 and 1991, respectively, that the drafters began to address the issue of award enforcement.[41]  Those treaties called for each party to "carry out without delay the provisions of any award resulting from an arbitration held in accordance with this Article.  Further, each party shall provide for the enforcement in its territory of such arbitral awards."[42]  However, while the provision is consistent with the ICSID Convention's principle of voluntary compliance with awards (as reflected in ICSID Convention, Article 53), there is no provision or guidance on what to do when a party does not comply.

The enforcement language in the U.S. BIT with Argentina (signed in 1991) became the most prevalent language on enforcement between 1991 and 2004.  It stated

---

[39]    *See supra* n. 38.

[40]    The United States recently updated its Model BIT in 2012.  The 2012 U.S. Model BIT is the successor to the 2004 U.S. Model BIT.  Other countries have Model BITs as well, some of which address enforcement of ICSID awards.  For example, the UK Model BIT (1991) directs disputing parties to diplomatic channels in case of non-compliance with an award.  The French Model BIT states that arbitral awards are final and binding ("définitives et exécutoires de plein droit").  The Chile Model BIT (1994) calls awards final and binding and provides for their enforcement only "in accordance with the laws of the Contracting Party in whose territory the investment was made."

[41]    The original 1983 U.S. Model BIT did not contain any provisions specifically addressing enforcement of arbitral awards (including ICSID awards).  Rather, the 1983 U.S. Model BIT merely confirmed the applicability of the ICSID Rules or the ICSID Additional Facility Rules.  A revised U.S. model BIT was adopted in 1994, after treaty negotiations with former Soviet states, and contained certain articles that provided for enforcement "without delay" of arbitral awards (including ICSID awards).

[42]    *Treaty Between the United States of America and the Republic of Poland Concerning Business and Economic Relations*, entered into force August 6, 1994, Art. IX(3)(e).

that "[a]ny arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement."[43]  This "final and binding" language strongly emphasizes the expectation of voluntary compliance.

  B.  *BITs Signed Since 2004*

  The 2004 U.S. Model BIT incorporated a provision in Article 34 relating to the timing to enforce an ICSID Award.  The identical provision appears in the 2012 U.S. Model BIT. Article 34(6) of the U.S. Model BIT prevents a disputing party from seeking enforcement of a final ICSID award until either (i) 120 days have elapsed from the date of the award and no party has requested revision or annulment proceedings, or (ii) revision or annulment proceedings are completed.  Substantively identical to the NAFTA Article 1136 (discussed below), Article 34 requires delaying enforcement of ICSID awards until there is no longer a possibility of the award being annulled or altered (subject to the unusual case of evidence of corruption being discovered within three years after the date of the award).  At that point, Article 34(5) calls for disputing parties to comply with the award without delay.

  Since the publication of the 2004 U.S. Model BIT, the United States has signed two BITs, with Uruguay in 2005 and with Rwanda in 2008.  Although other provisions of these BITs vary somewhat from the provisions of the U.S. Model BIT, Article 34 adheres to it closely in both cases.  Both the Uruguay and Rwanda BITs expressly provide that disputing parties may not seek enforcement of a final ICSID award until "120 days have elapsed from the date the award was rendered and no disputing party has requested revision or annulment of the award; or revision or annulment proceedings have been completed . . . ."[44]  As discussed below, this language mirrors NAFTA Article 1136 (which suggests that its inclusion is at the instigation of the United States).

  This language in Article 34 of the U.S. BITs with Rwanda and Uruguay has not yet been tested.  The Rwanda BIT has not yet entered into force, and only one case has been filed with ICSID against Uruguay, under the Switzerland-Uruguay BIT.[45]  As such,

---

[43] *Treaty Between the United States of America and the Argentine Republic Concerning the Reciprocal Encouragement and Protection of Investment*, entered into force October 20, 1994, Art. VII(6).

[44] *Treaty Between the United States of America and the Oriental Republic of Uruguay Concerning the Encouragement and Reciprocal Protection of Investment*, entered into force November 1, 2006, Art. 34(6); *Treaty Between the Government of the United States of America and the Government of the Republic of Rwanda Concerning the Encouragement and Reciprocal Protection of Investment*, signed February 19, 2008, *not yet in force*, Art. 34(6).

[45] Interestingly, Article 10 of the Switzerland-Uruguay BIT does not provide for ICSID arbitration.  Rather, it requires that the parties spend at least eighteen months in a

it is unclear whether and how Article 34 of the U.S. Model BIT will be applied in practice.

C.    *NAFTA*

NAFTA permits arbitration of investment disputes under the UNCITRAL Arbitration Rules, the ICSID Rules or the ICSID Additional Facility Rules.  However, of the three NAFTA members (United States, Canada and Mexico), only the United States is a full-fledged member of ICSID.  Canada has signed the ICSID Convention but not ratified it; and Mexico has not signed the ICSID Convention.  The United States has both signed and ratified the ICSID Convention.

Article 1136 of NAFTA permits disputing parties to seek enforcement of final ICSID awards only after (i) 120 days have elapsed from the date of the award and no disputing party has requested revision or annulment, or (ii) revision or annulment proceedings have been completed.  NAFTA therefore forbids enforcement of ICSID awards until after the time period to seek revision or annulment has elapsed or until the end of the annulment proceeding itself.  This is the same delay provision that appears in the 2004 U.S. Model BIT and the recent U.S. BITs with Uruguay and Rwanda.  However, the ICSID award enforcement-related provisions of Article 1136 have not yet been tested in practice.  The vast majority of NAFTA arbitrations have been *ad hoc* under the UNCITRAL Arbitration Rules rather than ICSID arbitrations.

## IV.    **Procedures Adopted by Other Signatory States and Authorities**

As noted above, over 140 states are parties to the ICSID Convention.  Some, like the United States, appear to have no express procedures to recognize and enforce awards. Others have issued detailed rules governing both the form and substance of filings seeking to enforce ICSID awards.  These rules have seen very little practical application, given the near universal practice of parties satisfying awards without the need for recourse to judicial proceedings.[46]   That said, they illustrate how other nations have addressed – or failed to address – the same set of questions relating to the appropriate procedures for the recognition and enforcement of ICSID awards.[47]

---

competent court in the host state, and then, should there be no resolution, they may proceed to *ad hoc* arbitration, with recourse to arbitration before the International Chamber of Commerce only as a last resort.

[46]   An exception is the successful proceeding to register an ICSID award, and unsuccessful attempted execution, under the 1966 Arbitration Act (U.K.) in *AIG Capital Partners Inc. and another v. Republic of Kazakhstan*, [2005] EWHC 2239, [2006] 1.W.L.R. 1420.

[47]   The following analysis is not intended as a comprehensive survey of practices in other jurisdictions, but is included for illustrative purposes based on a review of implementing statutes and, to the extent accessible, rules of procedure or rules of court for the following

Several jurisdictions have adopted procedures that require the submission of affidavits or other evidence supporting the application for recognition and enforcement, but do not require notice to the party against which recognition and enforcement is sought, at least in the first instance.[48]  Australia and the United Kingdom provide two key examples of jurisdictions where recognition may be obtained *ex parte* with minimal filings:

- In Australia, Federal Court Rule Order 68, which applies solely to proceedings to recognize ICSID Awards, requires (1) that a claim be filed stating the basis for the court's jurisdiction and the grounds upon which relief is sought, and (2) an affidavit stating the extent to which the award has not been complied with and the award debtor's last known place of residence or, if a corporation, its registered office, but expressly provides that "the application may be made without notice to any person."[49]

- Part 62.21(2)(c) of the United Kingdom's Rules of Civil Procedure, applicable to the High Court, requires that an application to register an award must include (1) the certified award (or a copy of it), with a notarized translation if not in English; (2) the name of the judgment creditor as well as the address for service within the jurisdiction; (3) the name of the judgment debtor as well as the address or place of business if known; (4) the grounds on which the judgment creditor is entitled to enforcement of the award; (5) the amount of money that remains unsatisfied on the award; and (6) a

---

signatories to the ICSID Convention: Australia (ICSID Implementation Act of 1990, amending the International Arbitration Act of 1974; Federal Court Rule 68); Ireland (Arbitration Act 2010); New Zealand (Arbitration (International Investment Disputes) Act of 1979; High Court Rules (enacted as Schedule II to the Judicature Act of 1908)); Norway (Act of June 8, 1967, relating to the implementation of the Convention of March 18, 1965 on the Settlement of Investment Disputes Between States and Nationals of Other States); Switzerland (Arrêté fédéral approuvant la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats, 12 Mars 1968; Loi Fédérale sur la poursuite pour dettes et la faillite, 11 April 1889); United Kingdom (Arbitration Act 1966; Civil Procedure Rules Part 62.21: Registration of awards under the Arbitration Act 1966).

[48]   One apparent exception to this rule is Switzerland, where actions to enforce ICSID awards are commenced with an application for a Payment Order, which can be obtained by the claimant without submitting any evidentiary support.  This Payment Order is served on the debtor, who has the option of filing a denial.  If the Payment Order is denied, the claimant must establish his legal entitlement.  If no denial is lodged, the claimant must still apply for a continuation of the enforcement proceedings.  Schneider and Knoll, *Enforcement of Foreign Arbitral Awards against Sovereigns – Switzerland*, *in* ENFORCEMENT OF ARBITRAL AWARDS AGAINST SOVEREIGNS (R. DOAK BISHOP, ed., 2009), at 313–14.

[49]   Federal Court Rule Order 68.

statement as to whether the enforcement of the award has been stayed (provisionally or otherwise) and whether any application has been made which might result in a stay of the enforcement of the award.[50]  Although an order registering the award may be obtained *ex parte*, that order must be served on the judgment debtor before execution proceedings may begin.[51]

States have adopted diverse procedures with respect to whether a court may or must stay an enforcement proceeding if the Award is itself subject (or may become subject) to a stay under the Convention.

- Ireland has adopted the position that a stay of a proceeding to enforce pecuniary obligations imposed by an award is mandatory "in any case where enforcement of an award has been stayed, whether provisionally or otherwise, in accordance with Articles 50, 51 or 52 of the Washington Convention."[52]  In any case where an application has been made under those articles which, if granted, might result in a stay on the enforcement of the award, stay of the enforcement proceedings is permitted, but not mandatory.[53]

- In the United Kingdom, stay of an enforcement proceeding is discretionary, even if enforcement of the award has been stayed under the Convention.[54]

- Norway adopts a more restrictive approach to stays.   Section 2 of the implementing statute provides that an award may be enforced in Norway *provided* enforcement has not been stayed pursuant to the rules of the Convention, and requires that, upon receiving information to the effect that enforcement of an award has been stayed, all enforcement proceedings shall be stayed.[55]  The mere submission of a request for an interpretation, revision or annulment of the award has been submitted (any of which could lead to a stay), however, does not permit a Norwegian court to stay enforcement proceedings.[56]

---

[50]   *See* Civil Procedure Rules, Part 62.21(2)(c) (referring to requirements under Civil Procedure Rule Part 74.4), and 62.21(4)(b).

[51]   *See* Civil Procedure Rules, Part. 62.21(2)(e).

[52]   Arbitration Act 2010, §25(7).

[53]   *Id.*

[54]   *See* Civil Procedure Rules, Part 62.21(5) (U.K.).

[55]   Act of June 8, 1967, §2.

[56]   *Id*.

These jurisdictions illustrate the two main approaches to the stay of enforcement proceedings when a stay of enforcement has been ordered under the ICSID Convention: (1) discretionary stay (U.K.), and (2) mandatory or automatic stay (Ireland, Norway). Of the jurisdictions that mandate a stay of enforcement, neither jurisdiction requires a stay of enforcement when a mere application for interpretation, revision or annulment of the ICSID award (which might result in a stay of enforcement) has been made (in fact, Norway expressly prohibits a stay of enforcement in such circumstances).

## V.      Review of Cases in the United States Involving ICSID Awards

This Committee is aware of only a handful of cases in the United States addressing the recognition and enforcement of ICSID awards, all decided by the federal court in the Southern District of New York. In each such case, the court recognized and enforced the ICSID award and entered judgment expeditiously on an *ex parte* basis. However, the cases are split on the issue of whether notice of the judgment must be provided to the judgment debtor before execution proceedings commence.

### A.      *LETCO*

The first case involved the Liberian Eastern Timber Corporation ("LETCO"), which sought recognition and enforcement of a final ICSID award against the Liberian government. LETCO commenced the proceeding by filing a document entitled "Application of Liberian Eastern Timber Corporation, Arbitration Award Creditor, For Enforcement of an Arbitration Award against the Government of the Republic of Liberia." The application sought recognition and enforcement of the award by requesting both the entry of judgment and the issuance of writs of execution allowing LETCO to commence execution of the judgment.

The judge sitting in the Motion Term, Part 1,[57] granted LETCO's application, issuing an *ex parte* order directing entry of judgment for the amount of the award "including interest, based upon and as specified in the award issued by the ICSID arbitration panel."[58] The order also provided that LETCO was "entitled to enforcement of the pecuniary obligation of the award in its favor, as rectified, in accordance with the provisions of 22 U.S.C. §1650a," and directed that the "annexed arbitration award . . . be docketed and filed by the Clerk of this Court in the same manner and with the same force

---

[57]     In the Southern District of New York, "Part 1" refers to a special motion part that addresses expedited or emergency applications. The judges in the Southern District take turns serving as the Part 1 judge for two-week periods.

[58]     *Liberian Eastern Timber Corp. v. Republic of Liberia,* 650 F. Supp. 73, 75 (S.D.N.Y. 1986) ("*LETCO*").

and effect as if it were a final judgment of this Court."[59]   The court provided no rationale for the *ex parte* nature of the *LETCO* order and judgment.

Following the entry of judgment and issuance of writs of execution to the U.S. Marshal, Liberia moved to vacate both the judgment and the writs of execution on the grounds that the court lacked jurisdiction to enter the judgment or execute the award against property pursuant to the FSIA.   Liberia also sought a preliminary injunction enjoining execution of the judgment pending the decision on other motions that it had filed.   The court upheld the entry of judgment but dissolved the writ of execution on the ground that the assets that were the subject of the writ were immune from execution under the FSIA.[60]

The Part 1 judge in *LETCO* recognized the ICSID award and entered judgment expeditiously.   This was consistent with Article 54 of the ICSID Convention.   But the Part 1 judge seems to have gone too far by also issuing a writ of execution and allowing execution to commence prior to affording Liberia the right to be heard.   In the subsequent proceedings, however, the court appropriately preserved Liberia's rights under the FSIA by vacating the writ upon Liberia's showing that the property that was the subject of the writ was sovereign rather than commercial in nature, and was therefore protected under the FSIA.   This finding was consistent with Article 55 of the ICSID Convention.

B.   *Enron and Sempra*

The *ex parte* order and judgment issued on behalf of LETCO in 1986 provided guidance for investors that prevailed against the Argentine Republic in two ICSID arbitrations in 2007 -- *Enron and Ponderosa Assets, L.P. v. Argentine Republic*[61] and *Sempra Energy International v. Argentine Republic*.[62]   In each of those cases, the award creditor filed an affidavit and a certified copy of its ICSID award on an *ex parte* basis in the Motion Term before the Part 1 judge, who recognized the awards and entered judgment on an *ex parte* basis.

The *Enron* and *Sempra* orders and judgments, which were substantively identical, provided, in pertinent part:

---

[59]   *LETCO* Order, re-printed in the Spring 1987 issue of the ICSID Review—Foreign Investment Law Journal.

[60]   *See LETCO*, 650 F. Supp. at 76–78.

[61]   *Enron Corp. v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 20, 2007) (order recognizing ICSID award and entering as a judgment).

[62]   *Sempra Energy Int'l v. Argentine Republic*, No. M-82 (S.D.N.Y. Nov. 14, 2007) (order recognizing ICSID award and entering as a judgment).

> It appearing that Arbitration Award Creditors . . . are entitled to immediate recognition and enforcement of the pecuniary obligations of the Award in their favor in accordance with the provisions of Article 53 and 54 of Section 6 of the ICSID Convention, as enabled by 22 U.S.C. §1650a . . . it is ORDERED that the annexed pecuniary obligations in the Award . . . be recognized and entered as a judgment by the Clerk of this Court in the same manner and with the same force and effect as if the Award were a final judgment of this Court[.][63]

In neither *Enron* nor *Sempra* did the court require that notice of the judgment be served on the judgment debtor.  In subsequent proceedings, both the *Enron* and *Sempra* awards were ultimately annulled.

C.     <u>*Siag*</u>

The Federal District Court for the Southern District of New York took a somewhat different approach in the matter of *Siag v. The Arab Republic of Egypt*.[64] Based on the procedure followed in the earlier applications for recognition in *Enron* and *Sempra*, the ICSID arbitration award creditors in *Siag* submitted an affidavit, a certified copy of the award in the underlying arbitration, and a proposed Order and Judgment essentially mirroring those that the Court accepted and endorsed in the earlier cases. Rather than immediately granting the relief sought, however, the court requested a memorandum of law addressing whether putative judgment debtor, Egypt, was entitled to notice and an opportunity to be heard before judgment is entered."[65]

In their memorandum of law, the award creditors briefly explained the background of the ICSID Convention as well as the arbitration award of which recognition was sought.  Citing ICSID Article 54, 22 U.S.C. §1650a, and the precedent set by the decisions and orders in *LETCO*, *Sempra*, and *Enron*, the creditors argued that their application should be granted on an *ex parte* basis.  In a written opinion going beyond the perfunctory orders issued in *Enron* and *Sempra*, the court generally agreed that the award should be entered as a judgment on an *ex parte* basis, but only after the moving party complied with the specific ministerial requirements of the CPLR applicable

---

[63]     *Enron Corp. v. Argentine Republic*, No. M-82, at 2.  In addition to *Enron* and *Sempra*, a review of the Southern District Court of New York docket reveals that in January 1988, Maritime International Nominees Establishment succeeded through their attorneys in obtaining an *ex parte* order and judgment against the Republic of Guinea.  In January 2004, Zhinvali Development Limited was similarly able to obtain an *ex parte* order and judgment in the Southern District of New York against the Republic of Georgia.

[64]     No. M-82, 2009 WL 1834562 (S.D.N.Y. June 19, 2009).

[65]     *Siag*, 2009 WL 1834562, at *1.

to recognition and enforcement of sister-state judgments. Specifically, the *Siag* court quoted both Article 54(1) of the ICSID Convention and 22 U.S.C. §1650a as the relevant authority requiring the immediate entry of judgment, and noted that federal courts enjoy exclusive jurisdiction over proceedings for recognition and enforcement of ICSID awards in the United States.[66]

The court then treated the ICSID award as the equivalent of a "final judgment of a state court" (mirroring the language of Article 54(1) of the ICSID Convention which requires courts in a country with a federal court system to treat an ICSID award as it were "a final judgment of the courts of a constituent state"), and stated that "the procedures of New York's CPLR are relevant" in determining how to treat a judgment of a state court.[67] The *Siag* court specifically relied on the Article 54 of the CPLR, which is entitled "Enforcement of Judgments Entitled to Full Faith and Credit." CPLR Article 54 is New York's adoption of the Uniform Enforcement of Foreign Judgments Act, a model statute adopted by forty-seven states that prescribes the procedure for enforcement courts when affording full faith and credit to a sister-state judgment.[68]

The court stated that "Article 54 of the CPLR sets up a procedure for the simple New York registration of an out-of-state judgment, obviating an action on the judgment"[69] by providing merely that an authenticated copy of a foreign judgment should be filed along with

> an affidavit stating that the judgment was not obtained by default
> in appearance or by confession of judgment, that it is unsatisfied in
> whole or in part, the amount remaining unpaid, and that its

---

[66] *Id.*

[67] *Id.* at *2.

[68] Citing *Keeton v. Hustler Magazine, Inc.*, 815 F.2d 857 (2d Cir. 1987), the court stated: [T]he Second Circuit held that Article 54 of the CPLR sets forth appropriate procedures for registering an out-of-state federal court judgment in the State of New York, and further held that it can function as a viable alternative to 28 U.S.C. §1963, the federal statute that governs registration and enforcement of an out-of-state federal court judgment." *Siag*, WL 1834562, at *2.

[69] *Id.* (quoting David D. Siegel, N.Y. Practice §435 (4th ed.)). The legislative history of Article 54 states: "The success of the Federal courts in working with a registration enforcement procedure very similar to that here proposed indicates the practicality and desirability of this proposal. It should be necessary as a matter of equity only to ensure that a defendant has had his full day in court. If he has had his full day in court in one state, it should be unnecessary, in a federal system such as ours, especially in view of our full faith and credit concepts, that he be given another full day in court in every state where the winning plaintiff attempts to enforce his judgment." New York Civil Practice Law and Rules, 2012 Annual § 54-2–3 (Matthew Bender 2012).

enforcement has not been stayed, and setting forth the name and last known address of the judgment debtor.[70]

The court in *Siag* further noted that the CPLR requires the clerk to "treat the foreign judgment in the same manner as the judgment of the supreme court of [New York] state"[71] and that "[a] judgment so filed has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating, or staying as a judgment of the supreme court of [New York] and may be satisfied in like manner."[72] At first blush, this language in the *Siag* decision, derived from CPLR 5403(b), would appear to open the floodgates to relitigation of issues that were finally decided in the initial forum. Indeed, this language in the *Siag* decision may have contributed to the decision by the award creditors in that case to abandon their recognition and enforcement efforts in the United States.[73] But the official commentary in the McKinney's annotations to this provision of the CPLR makes it clear that this language is not intended to expand the scope of review of a judgment (or award) that is entitled to receive full faith and credit:

> The language [of subdivision b] is that the filed judgment is subject in New York to "the same procedures, defenses and proceedings for reopening, vacating or staying" as a supreme court judgment is. That's too sweeping, and would violate the full faith and credit requirement if applied literally. . . . An attempt by New York, in the guise of a motion to "reopen" or "vacate" the judgment on the presumed authority of CPLR 5402(b), to relitigate the merits despite the presence of jurisdiction in [another] court, would violate the full faith and credit requirement.[74]

Mirroring the ministerial requirements of CPLR Article 54, the court in *Siag* ordered as follows:

> The judgment creditors should submit a true and accurate copy of the arbitration award, accompanied by an affidavit stating that the proposed judgment was not obtained by default and that it is unsatisfied in whole or in part. *See* CPLR §5402(a). The affidavit should also set forth the remaining unpaid amount, affirm that enforcement of the award has not been stayed, and set forth the proper address for notice to Egypt. *See id*. Upon the filing of such

---

[70]   *Siag*, 2009 WL 1834562, at *2 (quoting N.Y. C.P.L.R. §5402(a)).

[71]   *Id*. (quoting N.Y. C.P.L.R. §5402(b)).

[72]   *Id*. (quoting N.Y. C.P.L.R. §5402(b)).

[73]   Those award creditors took their ICSID award abroad for recognition and enforcement.

[74]   N.Y. C.P.L.R. §5402 (McKinney 1997).

> an affidavit, the judgment creditor shall, within thirty days,[75]
> provide proper notice of the filing to the judgment debtor. *Id*.
> §5403. I need not address at this juncture whether the Hague
> Convention has any application to the notice process.[76]

The wording of this directive is somewhat confusing.  Read literally, it seems open to an interpretation that required the award creditors to mail notice of the filing of their affidavit in support of recognition and enforcement of the ICSID award before judgment would be entered -- a requirement that would be tantamount to refusing to grant such relief on an *ex parte* basis.  However, it is clear from both the language of the CPLR (as well as the Uniform Act upon which it is based) and other text of the *Siag* decision that judgment would issue upon the *ex parte* filing.[77]  Courts and commentators have held that the notice requirement of the Uniform Enforcement of Foreign Judgments Act (upon which CPLR Article 54 is based) comports with constitutional principles of due process.[78]  For example:

> In *Gedeon v. Gedeon*[79] . . . the court upheld the constitutionality of
> the notice provisions of the Uniform Enforcement of Foreign
> Judgments Act. *The Act requires only that the judgment debtor be
> notified by mail at his last known address*, but further provides that
> there be a 10-day stay of execution; the Act also has liberal
> provisions for an additional stay of enforcement of the judgment
> and for further hearings. *The court held that the procedure of
> entering the judgment without formal notice or the requirement of
> a hearing does not constitute an unconstitutional taking of*

---

[75]   In its January 2, 1970 Report to the Legislature, the Judicial Conference described the rationale for the notice provision: "[The] notice by mail is . . . timed so that normally it will not interfere with the judgment creditor's collection efforts; yet it will alert the judgment debtor to the filing of the judgment and enable him to raise objections before distribution of the proceeds of an execution."   N.Y. C.P.L.R. §5401 notes to 1970 amendments (McKinney 2012).

[76]   *Siag*, 2009 WL 1834562, at *3.  The court, without citation, also "direct[ed] that notice be provided within thirty days to the United States Department of State, Office of Legal Adviser, with copy to the United States Attorney, Southern District of New York Civil Division."  *Id*.

[77]   For example, CPLR §5403 provides that "execution may issue immediately," and that is possible only with a judgment.

[78]   The vast majority of the 47 states that have adopted the Uniform Enforcement of Foreign Judgments Act require the notice to be sent "promptly" following entry of the judgment. None of the 47 states requires a notice period exceeding 30 days.

[79]   630 P.2d 579, 583 (Colo. 1981).

*property without due process of law. The court pointed out that this action involves a postjudgment procedure, the basic requirement of notice and hearing having been met by the court of the state which rendered the original judgment.* The court held that when the creditor's interest in collecting a valid judgment is balanced against the debtor's interest in keeping his property, which has already been protected by prior notice and hearing, the due process requirements of the United States Constitution were satisfied by the procedures of the Act.[80]

In sum, after "adopt[ing] the procedures of Article 54 of the CPLR"[81] the *Siag* court ruled that the ICSID award would be recognized and enforced on an *ex parte* basis, with notice to be served by mail within 30 days following the filing of the judgment as provided by Article 54 of the CPLR.

D.    *Issues Raised, but Left Unanswered*

These cases illustrate the need for standardized procedures for handling the recognition and enforcement (*i.e.*, entry as judgments) of ICSID Awards. The courts in *LETCO*, *Sempra*, and *Enron* expeditiously recognized and enforced the awards and entered judgment. The *Siag* decision was not perfectly clear as to the process to follow, so the ICSID award creditors in that case chose a different forum to enforce the award. Indeed, in the most recent case in which the Southern District of New York recognized and enforced an ICSID award as a judgment, the petitioner felt obliged to navigate through the disparate precedents, by seeking *ex parte* recognition and enforcement while also invoking the post-entry of judgment notice provisions of the CPLR.

In *Grenada v. Grynberg*, Grenada sought recognition of an award in which the ICSID arbitral tribunal dismissed the claimant's claims and ordered the payment of legal fees and costs of approximately $300,000. In its memorandum in support of recognition and enforcement, Grenada briefly explained the background of the ICSID convention as well as the underlying arbitration. Grenada also described the outcomes in *Enron*, *Sempra*, and *Siag*. Recognizing that the *Siag* court had adopted the procedures set forth in the New York CPLR, in its application Grenada undertook to provide notice of the judgment to the award debtors according to CPLR §5403, *i.e.*, within 30 days after the

---

[80]    31 A.L.R. 4th 706 §5 (1984) (emphasis added); *see also* 30 Am. Jur. 2d Executions §781 (2011) ("The notice provisions of the Uniform Enforcement of Foreign Judgments Act . . . do not violate a judgment debtor's right to the due process of law under the United States Constitution.").

[81]    *Siag*, 2009 WL 1834562, at *3.

entry of the judgment.  In an Order and Judgment filed on April 29, 2011, the court entered the Grenada award as "a final judgment of [the] Court."[82]

## VI.    Proposed Recognition and Enforcement Procedures

In light of the foregoing considerations, this Committee recommends the procedures set forth below for recognizing and enforcing an ICSID award in the federal district court for the Southern District of New York, subject to any different process expressly provided by the applicable BIT under which the underlying ICSID arbitration was brought.  The Committee believes that the proposed procedures will bring uniformity and certainty to a process that currently is unclear, while simultaneously (i) fulfilling the stated goal of the ICSID Convention to ensure swift recognition and enforcement of ICSID awards without judicial oversight or interference, (ii) complying with the U.S. enabling legislation (22 U.S.C. §1650a), and (iii) following established procedures for recognition and enforcement under existing and applicable law.

A party seeking to have an ICSID award recognized and enforced by a federal court in the Southern District of New York should submit to the court (i) an *ex parte* application setting forth the relief it seeks; (ii) an accompanying affidavit re-affirming the relief sought, providing background information concerning the arbitration, such as the identity of the parties and a short summary of the procedural history of the arbitration (when the hearing occurred, when the award was issued, etc.), and further comporting with the requirements of Article 54 of New York's CPLR;[83] and, (iii) a copy of the award, certified by the ICSID Secretary-General.  No notice needs to be provided to the opposing party at this juncture in the process.  This proposed procedure, isolated from considerations related to execution, allows for the swift recognition and enforcement of ICSID awards, which is a guiding principle of the ICSID Convention.  With such an *ex parte* proceeding, the award creditor is protected from any improper attempts by the award debtor to discredit or challenge the award, which would be contrary to the ICSID system, or to delay the *res judicata* effect of the award.  An award creditor will obtain

---

[82]   *Grenada v. Grynberg, et al.*, No. 11Misc00045 (S.D.N.Y. Apr. 29, 2011), at 2.  In another case, *Funnekotter et al. v. Rep. of Zimbabwe*, Case No. 1:09-cv-8168 (CM) (S.D.N.Y. 2010), the petitioners stated in their Petition to Confirm Arbitration Award Pursuant to 22 U.S.C. §1650a that the "Southern District of New York applies New York State Procedural law in adjudicating an ICSID award," cited to the *Siag* Decision, and complied with the requirements imposed by that Decision.  There was no discussion as to whether the *Siag* approach was valid or consistent with the ICSID Convention.  Both the petitioners and the court (the respondent State defaulted) assumed that this was the applicable procedure.

[83]   "The judgment creditor shall file with the judgment an affidavit stating that the judgment was not obtained by default in appearance or by confession of judgment, that it is unsatisfied in whole or in part, the amount remaining unpaid, and that its enforcement has not been stayed, and setting forth the name and last known address of the judgment debtor."  N.Y. C.P.L.R. §5402(a) (McKinney 2012).

recognition and enforcement (not execution) of its award immediately in the form of a judgment of the court.

Within 30 days of the filing of the district court's judgment, the judgment creditor should mail the judgment debtor a copy of such judgment.   Service of the entered judgment by mail is fully in keeping with the intent of the ICSID Convention as well as the language of the ICSID implementing statute, which references "full faith and credit," and New York's laws governing the recognition and enforcement of sister-state judgments that are entitled to receive "full faith and credit" in enforcement proceedings.[84]

If a judgment has been obtained against a foreign sovereign, one must consider whether, in addition to mailing the judgment within 30 days of filing, the judgment also should be served upon the sovereign pursuant to the FSIA.   Under Rule 4 of the Federal Rules of Civil Procedure a "foreign state or its political subdivision, agency or instrumentality must be served in accordance with 28 U.S.C. §1608 [the FSIA]."[85]   In other words, the FSIA provides the exclusive means of service on a foreign state, agency or instrumentality.[86]   Section 1608 of the FSIA establishes a hierarchy that requires a plaintiff first to serve process upon a foreign state, agency or instrumentality in accordance with any "special arrangement" for service that may exist between the parties.[87]   If no such arrangement exists, then the plaintiff must use any applicable international conventions governing service of process.[88]   If no conventions exist, then plaintiff must use other means specified in the FSIA.[89]

A cautious judgment creditor may choose to serve the judgment on a sovereign not only by mail, but also pursuant to the FSIA.   Service of the judgment by mail within the 30 day period prescribed by New York law might be considered an agreed-upon

---

[84] In further keeping with the provisions of the CPLR, "[t]he proceeds of an execution shall not be distributed to the judgment creditor earlier than thirty days after filing of proof of service" of the notice of judgment upon the judgment debtor.   N.Y. C.P.L.R. §5403 (McKinney 2012).

[85] Fed. R. Civ. P. 4(j)(1).

[86] *Id.*

[87] For example, a contractual provision stating that "all notices and communications between the parties shall be in writing and shall be effective, if delivered in person to the authorized representative of the recipient party at the address listed below" constituted a "special arrangement" for service of process under §1608 of the FSIA.   *See Space Systems/Loral, Inc. v. Yuzhnoye Design Office*, 164 F. Supp. 2d 397, 402 (S.D.N.Y. 2001).

[88] 28 U.S.C. §1608.

[89] *Id.*   The other means include sending a copy of the translated pleading to the head of foreign affairs of the foreign state or service through the U.S. Director of Special Consular Services.   28 U.S.C. §1608.

"special service" arrangement under the FSIA in light of the ICSID Convention and the implementing legislation that puts ICSID awards on par with sister-state judgments that are to receive "full faith and credit."  Nevertheless, under the FSIA a judgment creditor may not execute on the judgment against a sovereign without notice and a hearing in any event (as described above).  Similarly, the FSIA requires a federal district court to determine that "a reasonable period of time has elapsed following the entry of a judgment" prior to granting leave to commence execution activities, and parties seeking to execute on a judgment against a foreign sovereign must first make a motion on notice pursuant to 28 U.S.C. §1610(c) explaining why it believes that a reasonable period of time has elapsed and why execution should be permitted.  Because the main benefit associated with a judgment is the ability to attempt to execute on assets of a party that refuses to pay the judgment voluntarily, prudence dictates that service of the *ex parte* judgment take place against a sovereign pursuant to the other applicable mechanisms of the FSIA, since such notice is required to execute on the judgment in any event.  For this reason, and also because of the protections afforded by the ICSID Convention and Rules against execution if annulment proceedings are commenced, it is unnecessary for a judgment to impose an automatic stay on execution for any prescribed time.

**Committee on International Commercial Disputes of the New York City Bar Association**



### NEW YORK CITY BAR

*The Committee on International*
*Commercial Disputes*

---

Louis B. Kimmelman, Chair
Dana C. MacGrath,* Secretary

| | |
|---|---|
| Oliver J. Armas | Steven H. Reisberg |
| Hon. William G. Bassler | James M. Rhodes |
| James E. Berger | Jeffrey A. Rosenthal |
| George A. Bermann | Daniel J. Rothstein |
| Christopher P. Bogart | Arthur W. Rovine |
| Amal Bouchenaki | Ank A. Santens |
| Lorraine M. Brennan | Laura W. Sawyer |
| Paul H. Cohen | Jonathan D. Schiller |
| Louis Epstein | Laurence Shore |
| John L. Gardiner | Jonathan D. Siegfried |
| Marc J. Goldstein | Linda J. Silberman |
| James Hosking | Robert H. Smit |
| Edward G. Kehoe † | Edna Sussman |
| Brian King | William H. Taft * |
| Hon. John G. Koeltl | Daniel Tan |
| Birgit Kurtz | Kenneth T. Wasserman |
| Kim J. Landsman | Daniel H. Weiner |
| Jack P. Levin | Henry Weisburg |
| Stanley McDermott | Anne Marie Whitesell |
| Joseph E. Neuhaus | Joseph P. Zammit |
| Charles Platto | David Zaslowsky * |

\* Members of the Subcommittee that draft the Report
† Chair of the Subcommittee

THE ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK
42 West 44th Street, New York, NY 10036-6689   www.nycbar.org